T.C. Memo. 2014-85

UNITED STATES TAX COURT

GREGORY G. BOREE AND MELANIE M. BOREE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29549-11.                    Filed May 12, 2014.

David D. Aughtry and William E. Buchanan, for petitioners.

Brianna B. Taylor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  After concessions, the issues for decision relating to 2007

are whether petitioners' income relating to their sale of real property should be

**[\*2]** characterized as ordinary income or capital gain and whether petitioners are liable for a section 6662(a) accuracy-related penalty.[1]

FINDINGS OF FACT

Greg Boree and Daniel Dukes formed Glen Forest, LLC (Glen Forest), in September 2002. In November of that year, Glen Forest purchased, for approximately $3.2 million, 1,982 acres of land in Baker County, Florida (GF property). To finance the purchase, Glen Forest borrowed $1,861,000 from Perkins State Bank. In addition, petitioners contributed to Glen Forest approximately $250,000 that they had borrowed from their parents. To reduce their costs relating to the transaction, petitioners sold, immediately after the closing of the transaction, approximately 280 acres of the GF property to eight purchasers.

In December 2002, Glen Forest sold one 10-acre lot of the GF property.[2] During 2003, Glen Forest sold approximately 15 lots of the GF property, began

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect relating to the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Most of the lots that Glen Forest sold between December 2002 and January 2006 comprised approximately 10 acres of land. The lots were sold for between approximately $3,000 and $6,000 per acre.

[*3] building (i.e., at a cost of approximately $280,000) an unpaved road, and submitted to the Baker County Board of Commissioners (board) a conceptual map of West Glen Estates. West Glen Estates was a planned residential development consisting of over 100 lots. Glen Forest subsequently applied for, and received, exemptions from certain Baker County subdivision requirements. These exemptions allowed Glen Forest to sell lots without completing interior roads or submitting plats to the board. In 2003, Glen Forest executed a declaration of covenants, conditions and restrictions of West Glen Estates (declaration) and created a homeowners association to enforce the declaration and maintain the common area. The declaration defined, and consistently referred to Glen Forest as, "developer". In addition, it provided Glen Forest the right to designate at least one member of the board of directors of the homeowners association if "Developer holds for sale in the ordinary course of business at least five percent (5%) of the acreage in all phases of the property."

During 2004, Glen Forest sold approximately 26 lots of the GF property. In late 2004, the board adopted one-year moratoriums relating to permits for the development of nonplatted subdivisions, the development of lots on a road running through the GF property, and the development of subdivisions containing dirt roads.

**[*4]** During 2005, Glen Forest sold approximately 17 lots. In March of that year, petitioners purchased Mr. Dukes' interest and, as a result, became the sole owners of Glen Forest. The board, in April, adopted a requirement that roads on subdivisions be paved. Mr. Boree subsequently requested, and the board denied, an exception to that requirement. In May, Glen Forest submitted to the board a proposal that the GF property be rezoned as a planned unit development (PUD). The proposed PUD related to 982 acres of the GF property, consisted primarily of residential property, and contained a commercial zone and an equestrian recreational facility. Mr. Boree and his representative attended several board meetings relating to the PUD application.

During 2006, Glen Forest sold four lots.[3] In January of that year, the board adopted a requirement that developers pave certain public roads leading to their subdivisions. In April, Glen Forest and Adrian Development at Baker, LLLP (Adrian Development), entered into a purchase and sale agreement pursuant to which Adrian Development obtained an option to purchase most of the remaining GF property. Staff for the board recommended, in June, approval of Glen Forest's proposed PUD. In September, however, Glen Forest withdrew its application and

---

[3]One lot was sold in January, and the other three lots were sold between April and December.

[*5] instead requested non-PUD zoning changes.  In February 2007, Glen Forest sold, for approximately $9,600,000, 1,067 acres of the GF property to Adrian Development (Adrian transaction).

On their Forms 1040, U.S. Individual Income Tax Return, relating to 2005, 2006, and 2007, petitioners reported adjusted gross income of $2,322,652, $6,252,475, and $8,290,706, respectively.  Petitioners indicated on their Schedules C, Profit or Loss From Business, relating to these years that Mr. Boree's "Principal business or profession" was "Land Investor".  In addition, petitioners reported income from Glen Forest's sales of lots in 2005 and 2006 as ordinary income and deducted expenses relating to the GF property, claiming cumulative net losses of over $200,000.[4]  On their 2007 Form 1040 petitioners indicated that Mr. Boree's occupation was "Real Estate Professional"[5] and reported long-term capital gain of $8,578,636 relating to the Adrian transaction.

Respondent, on September 27, 2011, sent petitioners a notice of deficiency relating to 2007.  Respondent determined that petitioners' gain relating to the Adrian transaction did not qualify for capital gain treatment, petitioners had an

---

[4]During 2005, 2006, and 2007, Glen Forest did not engage in any significant activity unrelated to the GF property.

[5]On their 2005 and 2006 Forms 1040 petitioners indicated that Mr. Boree's occupation was "Logger".

[*6] income tax deficiency of $1,784,242, and petitioners were liable for a

$356,848 section 6662(a) accuracy-related penalty.  On December 27, 2011,

petitioners, while residing in Florida, filed a petition with the Court.

OPINION

The term "capital asset" excludes "inventory" and "property held by the

taxpayer primarily for sale to customers in the ordinary course of his trade or

business."  See sec. 1221(a)(1).  To determine whether an asset is a capital asset,

the Court analyzes the attendant facts and circumstances, including factors such as

"the number, extent, continuity and substantiality of the sales * * * [and] the

extent of subdividing, developing, and advertising".  See United States v.

Winthrop, 417 F.2d 905, 910 (5th Cir. 1969).  No specific factor or combination of

factors is controlling.  See Biedenharn Realty Co. v. United States, 526 F.2d 409,

415 (5th Cir. 1976).  In the Court of Appeals for the Eleventh Circuit, to which

this case is appealable,[6] "frequency and substantiality of sales" is oftentimes the

most important factor, because "the presence of frequent sales ordinarily belies the

_____

[6]We follow the relevant precedent of the Court of Appeals to which an
appeal would lie.  See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd,
445 F.2d 985 (10th Cir. 1971).  The Court of Appeals for the Eleventh Circuit has
adopted as binding decisions of the former Court of Appeals for the Fifth Circuit
handed down on or prior to September 30, 1981.  See Bonner v. City of Pritchard,
661 F.2d 1206, 1209 (11th Cir. 1981).

**[*7]** contention that property is being held 'for investment' rather than 'for sale.'"
See Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980).

Prior to the Adrian transaction, petitioners engaged in real estate development activities. Mr. Boree's testimony to the contrary was not credible and was convincingly contradicted by the documentary evidence.[7] Petitioners consistently treated Glen Forest as a real estate business and represented it as such to buyers of GF property, the board, and on their 2005, 2006, and 2007 tax returns. Glen Forest subdivided the GF property, built a road, spent significant time and money on zoning activities, and continued to pursue development activities after the board adopted the moratoriums and requirements. Moreover, between 2002 and 2006, petitioners sold approximately 60 lots comprising approximately 600 acres of the GF property.[8] Such sales, made to customers in the ordinary course of business, were frequent and substantial. Indeed, petitioners' actions from the time Glen Forest acquired the GF property, through the date of the Adrian transaction,

_____

[7]Pursuant to sec. 7491(a), petitioners have the burden of proof unless they introduce credible evidence relating to the issue that would shift the burden to respondent. See Rule 142(a). Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

[8]Accordingly, Glen Forest sold over one-third of the GF property in these transactions (i.e., excluding the approximately 280 acres sold in November 2002).

[*8] reflect their intent to develop the GF property and sell subdivided lots to customers. Petitioners' intent did not change when they became the sole owners of Glen Forest in 2005. To the contrary, petitioners continued to engage in significant sales and development activities; reported their sales of lots in that year as ordinary income; deducted, rather than capitalized, expenses relating to their real estate activities; and did not segregate the property sold to Adrian Development from the rest of the GF property. See Slappey Drive Indus. Park v. United States, 561 F.2d 572, 587-588 (5th Cir. 1977) (holding that the burden is on the taxpayer to establish that a portion of property held for investment was segregated from property held in connection with a business). Accordingly, petitioners' income from the Adrian transaction was ordinary. See Biedenharn Realty Co., 526 F.2d at 418 (frequent and substantial sales, together with development activity, "will usually conclude the capital gains issue against [the] taxpayer").

On their 2007 Federal income tax return petitioners incorrectly reported capital gain relating to the Adrian transaction and understated their tax liability by over $1,780,000. An accuracy-related penalty may be imposed with respect to an underpayment of tax that is the result of a substantial understatement of income tax. See sec. 6662(a), (b)(2). Pursuant to section 6662(d)(1)(A), this

[*9] understatement is substantial as it exceeds 10% of the tax required to be shown on petitioners' 2007 tax return. Respondent bears, and has met, his burden of production relating to the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Petitioners have not established reasonable cause for the underpayment or that the return was prepared in good faith. See sec. 6664(c); Higbee v. Commissioner, 116 T.C. at 448-449. Accordingly, we sustain respondent's determination relating to the 2007 section 6662 penalty.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered

under Rule 155.